1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10

11  ENCOMPASS INSURANCE          )   Case No. CV 12-08294- MWF (PJWx)
    COMPANY,                     )
12                               )   **FINDINGS OF FACT AND**
                  Plaintiff,     )   **CONCLUSIONS OF LAW**
13                               )
          v.                     )
14                               )
    MATTHEW BERGER and MADELYN   )
15  SWED,                        )
                                 )
16                Defendants,    )
                                 )
17  and Related Counterclaim.    )
                                 )
18  _____  )

19          This matter came on for trial before the Court sitting without a jury on July 22

20  through July 31, 2014, and August 8, 2014.  Following the presentation of evidence, the

21  parties made their closing arguments.  The matter was then taken under submission.

22          This dispute is between an insurance company and its insureds.  The insurance

23  company denied coverage for lifted walls, interior cracks and other damage to a residence

24  in Santa Barbara, California.  The parties agree that the damage arose from moisture

25  reaching the expansive soils under the residence.  Because certain policy exclusions would

26  facially appear to apply, the main issue to be decided is whether a wildfire was the

27  "efficient proximate cause" of the damage, as defined by California law.  To decide this

28  issue and the amount of damages, the Court must answer these main questions:

1.   What was the cause of the moisture that, through its effect on the expansive soils, caused the damage? Was it the utility trench (Defendants' position) or lack of vegetation (Plaintiffs' position) or was the cause unproven?

2.   If the cause of the moisture was the utility trench, was the wildfire the "efficient cause" of the trench?

3.   In its investigation of the damage and in making its coverage decision, did the insurance company fulfill its obligation of good faith and fair dealing to its insureds?

Having carefully reviewed the record and the arguments of counsel, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I.  <u>FINDINGS OF FACT</u>

1.     Plaintiff and Counter-Defendant Encompass Insurance Company ("Encompass") is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Encompass is, and at all times relevant to this action, has been a resident and citizen of the State of Illinois.

2.     Defendant and Counterclaimant Matthew Berger is, and at all times relevant to this action has been, a resident and citizen of the State of California.

3.     Defendant and Counterclaimant Madelyn Swed is, and at all times relevant to this action has been, a resident and citizen of the State of California.

4.     Defendants and Counterclaimants Matthew Berger and Madelyn Swed (the "Insureds") own the home located at 2618 Montrose Place in Santa Barbara (the "Property").

//

//

-2-

**A. The Property**

5.     The Property was built in 1953.

6.     The Property sits on expansive soils, which means the soils expand and contract with changes in the soil's moisture content.

7.     The Property's foundation was not designed or constructed to mitigate the effect of expansive soils.  Consequently, the Property has experienced minor foundation movement over time.

8.     In 1989, under a plan designed and implemented by civil engineer M. L. Grant, a system of eight underground piles up to 27 feet deep connected with a reinforced concrete grade beam were installed to underpin approximately half of the foundation perimeter on the Property's west side.  (Ex. 2).

9.     At the time Swed purchased the property in 1998, she retained M. L. Grant to inspect the Property and determine whether anything had moved since the caissons were installed.

10.    Grant's report concluded that while the underpinning of the Property had performed well, there had been some slab movement, and certain door frames were out of alignment.  (Ex. 49).

11.    On May 5, 2009, a wildfire known as the Jesusita Fire broke out in Santa Barbara, California.  The fire spread to the Property on May 6, 2009.

12.    The Jesusita Fire caused significant damage in the region where the property sits.  The Jesusita Fire also damaged the Property itself.  The Jesusita Fire scorched the Property's west, north, and east sides, burned the west wall of the house causing damage to the outside of a bedroom in the house's northwest corner, destroyed a shed, hot tub, wooden decks, and some vegetation on the Property's west side, and damaged eucalyptus trees on or near the property line on properties bordering the Property.  (*E.g.*, Exs. 218-026 to 218-041).

//

//

B. __The Policy__

13.    Encompass insured the Property under an Encompass Elite Policy, policy number 235400552, in effect under policy form G-18533-A and endorsement G-23286-J (the "Policy") (Ex. 90).

14.    The Policy provided as follows under the heading "**REAL PROPERTY - COVERED PERILS**":

> We cover direct physical loss to property described in **Real Property - Insuring Agreement,** unless the loss is not covered under **Property Coverage - Losses We Do Not Cover.**  (Ex. 90, G-18533-A, at 4).

15.    Under the heading "**LOSSES WE DO NOT COVER**" the Policy provided in relevant part:

> We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> 1.    Real Property and Tangible Personal Property.  We do not insure for loss:
>
> > * * *
> >
> > d.    Caused by or consisting of the following:
> >
> > > * * *
> > >
> > > (5)   Settling, shrinking, bulging, or expansion including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;
> > >
> > > * * *
>
> Under exclusions 1a., 1b., 1c., and 1.d., any ensuing loss from a covered peril to covered property not excluded or excepted in this policy is covered.  (Ex. 90, G-18533-A, at 11; G-23286-J, at 11).
>
> * * *

-4-

e.     To covered real property or tangible personal property caused by any of the following.  However, any ensuing loss not excluded or excepted in this policy is covered.

* * *

(3)     Faulty, inadequate or defective:

* * *

(a)   Planning, zoning, development, surveying, siting;

(b)     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

* * *

of part or all of any property whether on or off your residence premises.  (Ex. 90, G-18533-A, at 11-12).

f.     Caused by water damage, meaning:

* * *

(2)     Water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure . . . . (Ex. 90, G-18533-A, at 12).

* * *

m.     Caused by earth movement, meaning:

earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; mine subsidence; earth subsidence; sinkhole; or earth sinking, rising or shifting; or movement resulting

from improper compaction, site selection or any other external forces . . . (Ex. 90, G-23286-J, at 10).

16.     The Insureds have at all times fulfilled their obligations under the Policy.

**C. <u>The Post-Fire Repairs</u>**

17.     On May 8, 2009, the Insureds submitted a claim under the Policy to Encompass for the loss to the Property caused by the Jesusita Fire (the "2009 Fire Claim").

18.     Encompass designated the 2009 Fire Claim as claim number Z1081578.

19.     Encompass employed Mike Evanoff as the primary claim adjuster for the 2009 Fire Claim.

20.     Evanoff contacted the Insureds and commenced the adjustment process promptly after the Insureds filed the 2009 Fire Claim.

21.     The Insureds relocated temporarily while repairs took place.  The Insureds retained contractors, including Juan Perez, to restore the Property to its pre-fire condition throughout 2010 and 2011.  Evanoff spoke directly with the contractors regarding the scope and cost of the work, approved code upgrades covered under the Policy, and paid the contractors accordingly.

22.     The first restoration stage included, among other things, (i) removing fire debris; (ii) clearing most of the Property's vegetation and its irrigation system; and (iii) installing a drainage system to convey discharge from roof downspouts to a seepage pit in the backyard.

23.     Around July 4, 2009, the neighbor to the west of the Property cut down three partially-burned mature eucalyptus trees which stood approximately 50 feet tall on that neighbor's property approximately 14 feet from the west side of the Insured's house. (Exs. 97-19, 97-34).  Around the same time, the neighbor to the east cut down a 60-foot pine tree on the east side of the Property and pruned a redwood tree on the east Property line approximately six feet from the house on the Property.

//

24. The second restoration stage included (i) repairing the burnt and charred wood frame structure on the northern portions of the east and west sides of the house and smoke-related damage; and (ii) installing underground utilities for gas, water, and electricity in utility trenches.

25. The Insureds worked with Southern California Edison and obtained permission to locate the electrical utility underground in the existing utility trenches, rather than overhead. Above-ground electrical wiring was impractical because of a large olive tree between the street and the Property and changes to the building code that required the electrical drop and electrical panel to be moved. All parties agreed that underground electrical wiring was preferable. Evanoff approved the proposed underground utility trench, and Encompass paid for its installation. (Ex. 230).

26. The utility trenches extend from the southwest corner of the Property where the gas and water meters and electricity pole are located, along the west side of the house to the north. The main utility trench is approximately 36 inches deep and slopes downward from the street to the back of the Property.

27. In order to install the underground utilities during the restoration, the existing trenches were excavated, the utilities were in-laid with a small amount of sand at the bottom, and the trenches were refilled with native soil and compressed according to applicable building codes. (Exs. 97-52 to 97-54).

28. The landscape and irrigation system were reinstalled beginning in January 2010.

29. During these repairs, Berger and Swed both developed a warm professional relationship with Evanoff, and they felt that they could trust him and that he was concerned about their interests. Encompass spent approximately $400,000 in repairing the Property. The Insureds continue to use Encompass to insure the Property.

**D. The Damage and Investigation**

30. In mid-January 2010, the Insureds moved back into the Property while reconstruction was ongoing.

31.     In or around June or July 2010, minor floor and wall cracks began to appear in the northwest side of the house on the Property.  By February 2011, however, when the Insureds were considering an addition to their home, there was no significant cracking in the walls or signs of other distress.

32.     In or around April 2011, however, significant damage was evident at the Property.  Walls were separating from the floor, vertical joints on the walls were separating, walls were cracking, sheet rock was buckling and compressing, tiles throughout the house were dislodging from the slab, and doors were not fitting into their frames.

33.     There was significant cracking in the walls of the northwest bedroom and the hallway between the southwest and northwest bedroom of the residence.  (Exs. 218-086 to 218-089).  The wall between the northwest bedroom and bathroom separated entirely from the floor.  (Ex. 218-090).  The sheet rock of this wall separated at its joints.  (Ex. 218-092).  Although the door remained level, the door frame of the northwest bedroom was lifted from the floor, so the door no longer fits properly in the frame.  (Exs. 218-091, 218-094).  This damage was localized in the northwest bedroom and attached hallway, and in the wall separating the northwest bedroom from the adjacent bathroom.

34.     In an email dated April 12, 2011, Berger notified Evanoff of this damage, and of his belief that the damage might be covered under the Policy.  (Ex. 54).  Berger based this belief on his knowledge that neither he nor Swed had experienced this type of distress at any other time since purchasing the Property.  In other words, the Property had not suffered this sort of damage before the Jesusita Fire.

35.     Soon thereafter, Evanoff visited the Property, and was surprised by the severity of the damage.

36.     Evanoff suggested that the Insureds locate a geotechnical engineer to investigate the cause of the damage and determine an appropriate remedy.

37.     The Insureds were unable to locate a geotechnical engineer, and Evanoff suggested Robertson Geotechnical, Inc. ("Robertson Geotechnical"), a firm that

Encompass had not previously employed but that had been recommended by Encompass's counsel. The parties agreed to hire Robertson Geotechnical to investigate the damage. The Insureds could have objected to Robertson Geotechnical but did not do so. Evanoff did not tell the Insureds that Robertson Geotechnical had been recommended by counsel.

38. Promptly after being retained, Hugh Robertson of Robertson Geotechnical contacted the Insureds and arranged to inspect the Property.

39. Robertson visited the Property on August 31, 2011 and October 25, 2011.

40. During Robertson's first visit on August 31, 2011, the Insureds provided Robertson photographs and information about the Property and its history. Robertson also obtained and considered, among other things, construction permit documents for the Property, M. L. Grant's 1989 plans of the Property depicting the caisson underpinning work, a report regarding the Property's soil conditions from Pacific Materials Laboratory from April 2011, and an inspection report by C. L. Grant prepared in June 2011 discussing the potential reasons for the distress at the Property.

41. Robertson issued a report dated September 20, 2011 (the "First Robertson Report") setting forth his observations and opinions derived from his investigation up to that date. (Ex. 11). The First Robertson Report concluded that the distress to the Property did not result from the Jesusita Fire, but rather was caused by such factors as the age and nature of the construction, shrinking and swelling of highly expansive soils, creep and yielding of the descending slope, changes in drainage, landscaping and irrigation, new utility trenches, and the past underpinning of only a portion of the house.

42. The First Robertson Report recommended performance of leak testing and a manometer survey. Evanoff requested that Robertson perform these additional tests.

43. Accordingly, Robertson visited the Property again on October 25, 2011, a visit that lasted approximately six hours. He took a floor level survey using a manometer and observed a leak detection test performed by Taylor Leak Detection.

44. Robertson issued a second report dated November 10, 2011 (the "Second Robertson Report") setting forth his observations and opinions derived from his

investigation up to that date.  (Ex. 32).  The Second Robertson Report contained substantially the same conclusions as the First Robertson Report.

45.     The two Robertson reports used the terms "hypothesis" and "postulate" as synonyms for "opinion."  Each report renders the opinion that the Jesusita Fire did not cause the damage.  Each report suggests further testing that can be done to determine a proper plan for remediation of the damage.

46.     The Insureds believed that Robertson's investigation was insufficient to conclusively determine the cause of the damage.  Accordingly, the Insureds sought out a geotechnical engineer that could perform further investigation.

47.     Berger received a preliminary investigative report from Geolabs-Westlake Village ("Geolabs") on December 2, 2011 ("the Geolabs Proposal").  (Ex. 215).  The Geolabs Proposal indicated the work that Geolabs believed was necessary to ascertain the types of tests required to determine the cause of and remedy for the damage.

48.     Although Evanoff maintained that Encompass was not required to pay for the Geolabs Proposal, Encompass did pay for it.  (Ex. 243).

49.     Geolabs produced an estimate of $33,200 for the total cost to adequately investigate the cause of the damage.   (Ex. 214).  Geolabs did not comment on causation or comment on the accuracy of Robertson's conclusions; rather, Geolabs simply provided an estimate for the work necessary to thoroughly investigate the cause.

50.     Berger sent the Geolabs estimate to Evanoff on March 9, 2012.  Evanoff informed Berger that Encompass would not authorize the further Geolabs testing, and that any further testing must be at the Insureds' expense.  Evanoff was annoyed with the Geolabs Proposale (Ex. 214) because he had expected a review of Robertson's work; nonetheless, Encompass paid for the preparation of the Geolabs Proposal.

**E.  The Denial of Coverage**

51.     In a letter to the Insureds dated April 14, 2012, Encompass denied coverage for the claimed damage based on the Pacific Materials Laboratory report, the C. L. Grant report, and the Robertson reports.  (Ex. 213).

-10-

52.     Encompass denied coverage of the damage on the grounds that it "appear[ed to be] predominantly caused by settling and expansion of the property and soils, and resulting cracking, which is explicitly excluded under the Policy," and that "additional exclusions in the policy [] apply . . . include[ing]: (1) earth movement; (2) the exclusions for faulty, inadequate or defective design, workmanship, construction, grading, compaction, remodeling, materials or maintenance; (3) surface water and water below the surface; (4) wear and tear, aging and deterioration; (5) weather conditions; (6) acts or decisions or failure to act or decide; and (7) neglect." (*Id.* at 213-5).

53.     The denial letter's conclusions were based predominantly on the opinions rendered in the Robertson reports.

54.     The denial letter offered the Insureds the opportunity to submit additional information to contest the denial. (*Id.* at 213-12).

55.     The Insureds wrote Encompass on July 31, 2012, disputing the coverage denial and requesting that Encompass reconsider its position. (Ex. 32). The Insureds disputed the factual discussion and legal conclusions in Evanoff's letter. The Insureds stated their belief that the Robertson reports were only hypotheses and postulations, not conclusions, and that Robertson had not conducted sufficient investigation to determine whether the Jesusita Fire was the cause of the damage. (*Id.* at 11-13). The Insureds' letter did not provide the opinions of any engineer or construction professional.

56.     The denial letter used the same claim number, Z1081578, that Encompass had used to adjust all of the Insureds' claims with respect to the Jesusita Fire up to the date of the letter. On September 26, 2012, Encompass assigned a new claim number, Z1111244, to the claims Encompass had denied because of its conclusion that the claims did not arise from the fire. The Insureds view this change as significant. The Court does not.

57.     On September 26, 2012, Encompass filed the present suit seeking a declaration that the damage is not covered under the Policy. (Docket No. 1). On January

31, 2013, the Insureds filed the operative Amended Counterclaim for breach of contract and breach of the implied covenant of good faith and fair dealing.  (Docket No. 12).

### F.  Summary of Witness Testimony at Trial

#### 1.  Jon Wren, Ph.D., July 22 to July 23.

58.    Dr. Wren is an engineer and the Civil Engineering Practice Director for Exponent, which was hired by Plaintiff to produce an expert report regarding the cause of the damage at the Property.  (Ex. 91).  Dr. Wren testified regarding the conclusions Exponent reached following their investigation.

59.    The principal conclusion of Exponent's report is that the damage at the Property is primarily the result of water being conducted along the main utility trench along the west side of the Property, pooling in the expansive soils beneath the concrete slab below a wall in the northwest portion of the house, and causing the soils to expand and exert pressure there and cause damage localized at that portion of the Property.

60.    Dr. Wren described how water passes quickly through the highly permeable sand in the trench.  At the point where the depth of the trench changed, water pooled because it flowed much more slowly because the clay soil was much less permeable than the sand in the trench or the fill.  This point was where the electrical lines entered the Property, at the northwest side of the residence.  At that point, which Dr. Wren described as the terminus of the deep trench, the depth of the trench abruptly reduced from approximately 36 to approximately 24 inches.  The result was that water was quickly conveyed to this terminus point, where it pooled and seeped out radially.  This pool at the terminus point of the deep trench would have extended in part to the area beneath the northwest wall where the damage was localized.  Dr. Wren believed that the trench should have been constructed differently in order to convey water away from the Property and toward the street.

61.    Dr. Wren examined the likelihood that the removal of three eucalyptus trees fifteen feet from the west side of the Property caused significant distress.  He testified that the trees would likely have caused more evenly distributed changes in moisture instead of

the highly localized damage that in fact has occurred.  Furthermore, because the eucalyptus trees were located fifteen feet away, and on a downward grade three to four feet below the building pad, Dr. Wren believed it was extremely unlikely that any of the eucalyptus roots would have reached an area near the Property itself.

62.   Dr. Wren testified that other changes in vegetation and irrigation from the post-fire changes and repairs also would not have caused the localized damage, because there was little change in vegetation or irrigation near the slab below the northwest bedroom, where the damage is localized.  Furthermore, the damage from vegetation changes would most likely have occurred within several months after the changes themselves; the fact that damage did not manifest until 18 months after the changes in vegetation suggested to Dr. Wren that those changes could not have caused the localized damage in the northwest bedroom.

63.   Dr. Wren testified that the photographic evidence following the fire showed that there was only medium to low soil burn following the fire, and that the top several inches of soil were reworked and shifted during the post-fire repairs, which would have disrupted the soil burn effect.

64.   Dr. Wren testified that study of landscape elevation levels in the Santa Barbara area generally could not provide meaningful conclusions as to the Property itself, and especially as to the highly localized damage on the Property.

65.   Exponent's testing of the moisture level of the soils near the trench led Dr. Wren to conclude that the trench was the most likely cause of the damage.  Dr. Wren did not test the soil in the trench itself, but rather two to three feet away from the trench, in order to avoid the utility lines.  Dr. Wren's analysis of historic rainfall showed that the Jesusita Fire occurred in a period of drought, followed by two years of above-average rainfall culminating at the time the damage was first witnessed in 2011.

66.   Dr. Wren further testified that the main utility trench could be repaired to stop conducting water by excavating the trench, removing the sand layer, and adding waterproofing on the side approaching the Property.  Once the trench no longer conducted

water, the expansive soils would dry over time and settle down, and the damage attributable to the trench could be repaired.  Nevertheless, because of the way the foundation of the Property is constructed and the nature of the expansive soils on which it sits, Dr. Wren was of the opinion that some cracking and other damage will inevitably occur in the future even once the utility trench is repaired.

### 2.  Ronald Pike, July 23 to July 24.

67.    Pike provided testimony both as a percipient witness to work done at the Property and as the person most knowledgeable for Pacific Materials Laboratory ("Pacific Materials").  Pike could not be present at trial, so a videotape of his deposition was played.

68.    Pacific Materials was retained to provide a soil report in connection with the Insureds' plan to build an addition to the house on the Property.  Pacific Materials provided a report to the Insureds on April 4, 2011, summarizing its conclusions.  (Ex. 5). The report looked solely at the condition of the soil following the drilling of two seven-foot borings and laboratory analysis of the soil removed.  It noted that the soils below the house were highly expansive, consisting of a three-foot layer of black clay, becoming a tan shale at the depth of 3 feet.  (*Id.* at 5-4).

69.    Pike visited the Property in February 2011, and he entered the house on the Property.  He testified that he was surprised to see that there was little or no cracking in the floors, ceilings, walls, and doors.  He was surprised because he knew the house sat on expansive soils, which would be expected to cause distress and damage over time.

70.    Pike recommended that any addition to the house on the Property must have a foundation that resists the effects of expansive soil in order to comply with applicable building codes.

### 3.  Professor Bodo Bookhagen, July 24 to July 25.

71.    Professor Bookhagen is a hydrogeomorphologist and at the time of his testimony he was an associate professor in the geography department of University of California, Santa Barbara.  He served as the expert witness for the Insureds.  He provided

two depositions in this case, and portions of each served as his trial testimony because he was unavailable at the time of the trial.  The first deposition, held in October 2013, was his original expert deposition.  The second deposition, held in July 2014, was ostensibly a trial testimony preservation deposition, but Professor Bookhagen introduced significant new testimony.  By its Order dated August 12, 2014, the Court excluded all testimony that was provided for the purpose of rebutting Dr. Wren; specifically, Exhibit E and related testimony.  (Docket No. 90).  The Court admitted all other portions of the depositions as designated by the parties.

72.     Professor Bookhagen prepared an expert report in which he examined data related to the region in which the Property is located and rendered opinions based on this data and his discussions with the Insureds regarding the Property before and after the Jesusita Fire.  (Ex. 114).  The report concluded, and Professor Bookhagen testified, that changes in vegetation, irrigation, and soil constitution led to increased variability in soil moisture content, which was the primary cause of the damage at the Property.  The three-foot black clay top soil layer is resistant to changes in surface water, so changes in elevation are most likely to result from the more sensitive shale layer below the top clay layer.  The moisture in the shale layer is likely to be controlled and moderated by mature tree roots, such as the eucalyptus trees at the border of the Property that were removed following the Jesusita Fire.  Without mature trees, deeper soil layers will dry out as there are no deep roots to draw up groundwater.  Thus, in Professor Bookhagen's opinion, the removal of the eucalyptus trees increased variability in soil moisture which would have caused changes in elevation leading to cracking in the walls of the house.

73.     Professor Bookhagen testified that several other changes in vegetation, irrigation, and soil constitution likely exacerbated the moisture variability leading to damage.  The large-scale loss of vegetation in the region would have led to extraction of water from greater depths, reducing the ground-water level.  The soil present in the region surrounding the Property would likely have increased water-repellency because of the creation of a wax layer following a fire, leading to drier soil conditions.  Minimal

reworking of the soil would likely be insufficient to offset this effect, because the wax particles would remain.  And the fact that the Property was vacant for nine months due to post-fire repairs would have dried out the soil as well, as there were no utilities running and no landscape to irrigate.

74.     Professor Bookhagen supported his conclusions with an examination of satellite data in the region, which confirmed his hypothesis that the months following the Jesusita Fire saw drastic upward and downward shifting in the elevation of the region in which the Property sits.  (Ex. 249, Second Deposition Exs. B-C).  Specifically, Professor Bookhagen noted a rapidly declining surface elevation between May and August 2009, followed by an increasing surface elevation for the next year.  (*Id.* Ex. C).  These conclusions represented an average of the region in which the Property sits based on 144 satellite data points, but Professor Bookhagen agreed that none of these data points were actually on the Property.

### 4. Charles Swift, July 25.

75.     Swift testified about the investigative work that the Insureds hired Geolabs to perform.  The Insureds sought an opinion as to the cause of the damage to the Property.  Geolabs was originally hired to complete a preliminary survey to obtain an overview of the state of the Property and recommend testing to render a conclusive opinion as to the cause of the damage and the repairs necessary to remediate the damage.  (Proposal for a Preliminary Forensic Review, December 2, 2011, Ex. 215).  After conducting the preliminary review, Geolabs prepared an estimate for a preliminary geotechnical study, including a manometer survey and drilling and testing soil at various borings in and around the Property.  Geolabs estimated this work would cost $33,200.  (Estimate for Preliminary Geotechnical Study, March 5, 2012, Ex. 214).  Swift then testified about the geotechnical work that Geolabs performed at the Property in anticipation of litigation, culminating in the Preliminary Geotechnical Investigation Report Geolabs provided to the Insureds on January 13, 2014.  (Ex. 245).  Swift's testimony was limited to the basic facts of the investigation, because Swift was not permitted to render expert testimony.

### 5. Lawrence Stark, July 25.

76.     Stark, a Geolabs geotechnical engineer, produced the Geolabs expert report and testified as a damages expert. Pursuant to this Court's Order dated May 19, 2014 (Docket No. 56, at 8), Stark was not permitted to testify as to causation, and the Court does not consider those portions of the expert report relating to causation. Stark testified about the same estimates and reports that Swift discussed, and provided more detail regarding the substance of the work performed by Geolabs and the bases for its conclusions.

77.     Stark described the subsurface testing Geolabs performed at the Property in 2013 and 2014. These tests suggested that the volume change in soils caused the damage to the Property, because increased water content caused the soils below the foundation to expand and lift the concrete slab. The tests did not confirm or deny a particular cause of the sudden soil expansion, but Stark formed the opinion that the large-scale removal of vegetation on and surrounding the Property likely had a greater effect on the Property than the possible conduction of water through the main utility trench.

78.     Stark testified that the proper remediation of the damage to the Property included a full-scale repair of the foundation. Because the foundation was not constructed to withstand significant changes in the volume of expansive soils below the house, the foundation required certain upgrades, including underpinning of those parts of the foundation that were not underpinned in 1989, and replacement of the original slabs with modern slabs designed for expansive soils. Stark estimated that these repairs would cost in the "ballpark" of a "quarter to a third" of a million dollars.

79.     Stark testified that these upgrades were necessary for the foundation of the house to withstand changes in elevation from the expansive soils. On cross-examination, he agreed that these changes were upgrades, using the analogy of replacing an old Volkswagen with a "current model of Ford" according to "current codes."

//

//

-17-

### 6. Mike Evanoff, July 29.

80.     Evanoff testified about his work adjusting the 2009 Fire Claim.  He testified about the approximately $400,000 of claims that Encompass covered in fire repairs, before being called in April 2011 to investigate significant cracking in the walls of the house. Based on his testimony and demeanor, and consistent with the testimony of Berger and Swed, Evanoff was caring and sympathetic to the Insureds.  The Court finds him a highly credible witness.

81.     Evanoff explained the process by which he decided to deny the claim for this significant cracking in the walls.  After a series of discussions with the Insureds, Evanoff agreed to hire a geotechnical expert to render an opinion on the cause of the damage to the Property and suggestions for remediation.  With the Insureds' consent, Encompass hired Robertson, whom Evanoff believed was a reliable and impartial engineer and whom Encompass had not hired in the past, although Allstate has.  Evanoff relied on Robertson's conclusions resulting from his investigation of the Property.  (Encompas Exs. 11, 32). Evanoff also considered the preliminary investigation reports from Geolabs, described above, although Evanoff believed it was not necessary to employ multiple experts to determine the cause of the damage.  (Exs. 214-15).

82.     On the basis of these reports, Evanoff decided that this harm was not covered under the Policy, and he denied the claim in April 2012.  (Ex. 213).  He determined that the damage was "predominantly caused by settling and expansion of the property and soils, and resulting cracking, which is explicitly excluded under the Policy."  (*Id.* at 5). Although Evanoff knew that the Insureds believed that more work was necessary to determine the cause of the damage, Evanoff did not believe that the Insureds had presented any credible evidence that further testing was necessary.

### 7. Hugh Robertson, July 29.

83.     Robertson testified about the process of being retained by Encompass and completing his investigative work at the Property, leading to the production of his two reports.  (Exs. 11, 32).

84. Robertson spoke with the Insureds, reviewed photographic evidence following the Jesusita Fire, reviewed the data collected and reports produced by Pacific Materials, C.L. Grant, and Taylor Leak Detection, and conducted an independent manometer survey to compare to the prior manometer surveys.

85. Robertson clarified that his reports' use of the terms "postulates" or "hypothesis" to describe the statements rendered therein should have been stated more accurately as "opines" or "opinion." He intended to express that while the statements were not made with scientific certainty, they were a result of a thoughtful approach based on the available information and thus should be considered opinions. His use of the term "likely" in reference to likely causes of damage to the Property was intended to convey a 90 percent or greater level of certainty.

86. Robertson testified that he regularly worked on behalf of both insurance companies and insureds, and had not previously been hired by Encompass prior to completing his work at the Property. He testified that he did not tell either of the Insureds, in words or in substance, that he had been hired to identify a basis on which Encompass could deny the claim.

**8. Madelyn Swed, July 30.**

87. Swed testified about her personal knowledge of her purchase of the Property in 1998, the Jesusita Fire, and post-fire repairs. She testified that the cracking and other damage noticeable in the walls of the house are significantly more serious than anything she has experienced in the years she has owned the Property.

88. Swed testified that while Robertson was investigating the Property, he stated to her something to the effect of, "You know how this works. I'm here to find a basis for Encompass to deny the claim." She testified that that statement was shocking and upsetting, but she remained convinced that Evanoff would act fairly and honestly.

**9. Juan Perez Jasso, July 30.**

89. Perez testified regarding his personal knowledge of the post-fire repairs. Perez, a licensed contractor, completed many post-fire repairs at the Property himself. He

dug out the main utility trench running from the street along the west side of the Property, set the utility lines in the trench, and refilled it.

90.     Prior to completing construction of the utility trench, Perez met with a planner from Southern California Edison, who gave instructions on where to put the electrical meter, which defined, at least in part, the design of the utility trench.  Although there was no code requirement that the utilities be placed underground, the Edison planner and a building inspector for the County of Santa Barbara further recommended that the power lines be placed underground, to avoid the complications, such as interference from trees, that could result from running the power lines above ground from the street to the new location for the electrical meter.

91.     Perez followed his normal practice and applicable building codes in construction of the trench.  The trench was inspected by an appropriate authority of Southern California Edison.

92.     Perez testified that the trench was not uniformly deep, but in fact was deeper and wider as it approaches the street: as deep as 48 inches at the street end of the trench. Perez testified that the trench slopes downward from the northwest side of the house to the south, where it meets the street.  After a rain event, Perez noticed some water pooling near the southern street-side end of the trench.

93.     Perez also provided a series of estimates for completing the work that Stark and Geolabs recommended to remediate the problems with the foundation of the Property. On February 23, 2014, Perez estimated that the foundation remediation would cost $196,709.80.  (Ex. 250).  He testified that this estimate was based on a misunderstanding that only the grade beams and caissons on the west side of the house would be reinforced and underpinned.  He corrected this misunderstanding in his second estimate, dated June 30, 2014, in which he estimated that the remediation would cost $305,670.00.  (*Id.*).

94.     Perez estimated that it would cost approximately $26,208.50 to repair all of the visible distress and cracking at the Property (*id.*), and $4,500 to dig out and backfill the utility trench to prevent conduction of water.

**10.  Matthew Berger, July 30 and July 31.**

95.    Berger testified to his personal knowledge of his time visiting and living at the Property since approximately 1997, the post-fire repairs, and his interactions with Encompass.  He corroborated Swed's testimony regarding the damage to the house in the aftermath of the Jesusita Fire, including his experience that there had never been distress and cracking in the house at any point prior to the distress that began appearing in 2011.

96.    Berger was the primary point of contact between the Insureds and Encompass throughout the investigation of the Insureds' claims under the Policy following the Jesusita Fire.  Berger believed that Evanoff treated the Insureds fairly in adjusting their claim, until Evanoff received reports from Robertson and denied the claim without doing further investigation to test Robertson's hypotheses.  Berger also recalled Swed recounting Robertson's statement to her that he had only been hired to find a basis on which Encompass could deny the claim.

97.    Berger further testified that the Insureds had incurred approximately $476,000 in legal fees and costs in prosecuting and defending this action.

**11.  Andrew Gillespie, July 31.**

98.    Gillespie is a contractor who testified as an expert on whether or not the electrical service drop was required to be placed underground and on the cost to implement Dr. Wren's proposed remediation for the damage to the Property.  He submitted an expert report on these topics.  (Ex. 93).

99.    Gillespie reviewed the Property and applicable building codes, spoke with government officials and supervisors at Southern California Edison, and determined that the Insureds were not required to place the electrical service drop underground.

100.   Gillespie further estimated that it would cost approximately $5,173.80 to excavate and remove the sand base of the existing utility trench, install waterproofing, and backfill the trench in order to prevent the trench from conducting water to the northwest side of the Property.

//

### 12. Anthony Cannon, July 31.

101.   Cannon is a lawyer with experience as an insurance claims adjuster who testified about the reasonableness of Encompass's handling of the claim that the Insureds submitted following the Jesusita Fire.  He submitted an expert report on these topics.  (Ex. 92).

102.   Cannon reviewed documentary evidence, deposition transcripts, and communications between the parties and rendered the opinion that Encompass's handling of the Insureds' claim comported with proper and reasonable insurance industry standards and practices.  He testified that Encompass conducted a proper investigation and correctly concluded that the damage of which the Insureds complained was caused by various excluded causes.  Encompass further responded to all of the Insureds' valid concerns regarding Encompass's investigation.  Finally, Cannon testified that although the Insureds believed more testing was necessary to ascertain the cause of the damage, the Insureds did not provide any reasonable basis on which to conclude that Encompass's investigation was inadequate, and an insurance company is not required to continue investigating based on its insureds' belief that is unsupported by competent scientific evidence.

103.   Cannon testified that he regularly served as an expert witness both for and against insurance companies, and that although he could not recall having worked for or against Encompass in the past, he has regularly served as an expert on behalf of Encompass's parent company, Allstate Insurance Company.

### G. Findings of Fact Related to Liability

104.   Applying the conclusions of law found in paragraphs 154-174, the Court makes the following findings of fact related to the efficient proximate cause.  Applying the conclusions of law found in paragraphs 175-181, the Court makes the following findings of fact related to the claim for breach of the covenant of good faith and fair dealing.

//
//

### 1.  The Cause of the Damage

105.   The most important or efficient proximate cause of the damage to the Property was the Jesusita Fire.

106.   The secondary, less important cause of the damage to the Property was the nature of the foundation of the house, which was not designed to withstand significant expansion of the expansive soils underlying the house.  This cause is less important than the Jesusita Fire because there is no evidence that the Property had ever experienced distress and damage like that currently present on the Property, which suggests that the significant changes to the Property occurring after the Jesusita Fire are more important causes than the underlying problems with the foundation that have remained largely unchanged for more than half a century after the construction of the house.

107.   Following the Jesusita Fire, a number of repairs and changes occurred on the Property that affected the soil moisture content and resulted in damage to the house.  The Jesusita Fire was the proximate cause of two changes in conditions at the Property that each contributed significantly to the damage at the Property: (a) the removal of vegetation and changes in irrigation that led to a significant increase in soil moisture variability at the Property, and (b) the construction of a utility trench that tended to conduct water to a specific location on the Property.

108.   Both the timing and the location of the damage lead to the conclusion that the utility trench, rather than changes in vegetation and irrigation, is the more important cause of the damage.  The damage was localized in the northwest portion of the house, and specifically in the wall separating a bedroom and bathroom in the northwest end.  This is precisely the location where water would pool after being conducted through the trench's sand layer to the location where the trench abuts the property's foundation and where the trench is abruptly made shallower as the electrical lines run from the deep main trench to the electrical panel.

109.   The damage began appearing in late 2010 and early 2011, more than a year after the vegetation was removed, and the damage did not fully manifest until

approximately April 2011.  Even Professor Bookhagen agreed that changes in soil moisture resulting from removal of mature tree roots would likely occur within a year following the removal of the trees, because the trees can maintain soil moisture for approximately one season.  (Ex. 114, at 2-3).  Furthermore, it is unlikely that the removal of the three large eucalyptus trees would have caused rapid, highly localized damage to the house located about 15 feet away from the trees and on a slope approximately 4 feet above the trees.  The decreased moisture resulting from removal of vegetation could have caused some changes in soil elevation, which might have contributed to the damage but was not a significant cause.

110.   The most important cause of the damage was the construction of the utility trench partially filled with sand and abutting the foundation near the wall separating the northwest bedroom and bathroom.  As Dr. Wren testified, the trench conducts water toward the expansive soils immediately below this wall, resulting in heaving of the foundation and causing cracking in the walls and floors and separation of the walls from the floors.  The fact that the damage occurred almost exclusively at the precise location where the sand-filled utility trench is closest to the foundation and where water conducted through the sand would naturally pool in the native clay strongly suggests that the conduction of water through the trench caused the damage.  The Property experienced higher than average rainfall in 2010 and 2011, which explains why the worst damage manifested in or around April 2011.

111.   The Court also bases its finding on the credibility of Dr. Wren and the thoroughness of his report.  The major weakness in Dr. Wren's testimony, apart from the testimony of Professor Bookhagen, was the lack of evidence of a pronounced slope for the utility trench, which would have been consistent with the flow of water abruptly meeting the shallower cut at the crucial location.  Nonetheless, having questioned Dr. Wren on this point, and having weighed the photographic evidence and the testimony of Perez, the Court finds that Dr. Wren provided the most explanation for the damage that was most consistent with all the evidence.

112.   Although the Insureds were not required by any applicable building code to place the electrical service underground, the electrical service needed to be altered following the Jesusita Fire.  A representative from Southern California Edison visited the Property and instructed the Insureds that the electrical panel needed to be moved. Accordingly, keeping the electrical wiring intact and unchanged was not an option, so the Insureds were faced with the option of constructing new above-ground electrical service or constructing new below-ground electrical service.  Furthermore, excavation of the utility trench was required to replace water lines, which were broken during the initial phase of the post-fire repairs.

113.   After review of the state of the Property, including large trees that rendered above-ground wiring problematic, all parties agreed that the best solution was to place the electrical service in a trench that would also contain the gas and water lines.  Evanoff agreed to fund the construction of the utility trench as part of the post-fire repairs.

114.   The utility trench was constructed according to standard industry practice and in compliance with all applicable laws.

115.   There is no evidence that the trench was constructed negligently.  Although with the benefit of hindsight and extensive scientific investigation by Dr. Wren and Exponent, it is now clear that the utility trench should have been constructed with no sand and with a waterproofing layer to prevent conduction of water, there is no reason to believe that Perez or the Insureds were negligent for failing to investigate this possibility prior to construction.  Indeed, it is unclear that further investigation by Perez or the Insureds would have uncovered the likelihood that the trench would cause significant damage if it were not waterproofed, because even the investigations of Robertson, an engineering geologist, and Stark, a geotechnical engineer, were unable to identify the trench as a likely cause of the damage.

116.   The lack of negligence is enhanced by a dispute between the parties about the grade of the utility trench.  Dr. Wren insisted that the utility trench slopes toward the street and, to some degree at least, slopes back toward the house, thereby increasing the flow of

the water.  Perez insisted that the trench slopes toward the street.  The Court agrees that the final portion of the utility trench slopes toward the street.  Based on the photographic evidence, the utility trench looks to be almost level.  If it slopes toward the back of the property, as Dr. Wren insists, then that slope is slight.  The lack of a significant grade supports the finding of no negligence.

117.   Accordingly, the Jesusita Fire was the efficient proximate cause of the damage to the Property, because it resulted in the construction of the main utility trench that conducts water to the site of the damage.  While the lack of vegetation might have contributed to some of the moisture under the house, that was not an efficient proximate cause of the damage to the house for which the Insureds seek coverage.

### 2.  Policy Coverage for the Damage

118.   Because the Jesusita Fire was the efficient proximate cause of the damage and fire damage is not excluded under the Policy, the damage is covered under the Policy.

### 3.  Damages Under the Policy

119.   The Insureds seek four tranches of damages under the Policy: the cost of reconstructing and underpinning the house's foundation (including the cost to the Insureds of relocating during construction), the amounts paid to Geolabs in connection with litigation to investigate the appropriate remedy for the damage, the cost of excavating and waterproofing the utility trench, and the cost of repairing the cosmetic damage inside the house.

120.   The Insureds argued during their closing statement that if the Court were to conclude that the Jesusita Fire was the proximate cause of the damage, they should be entitled to $438,755.98 on the breach of contract claim, including $391,675 for reconstruction of the foundation and moving and relocation costs during construction and $47,080.98 for the investigation performed by Geolabs.

121.   The Insureds argued that, alternatively, if the Court were to conclude that the utility trench was the proximate cause of the damage, they should be entitled to $78,463.28 on the breach of contract claim, including $47,080.98 for the Geolabs

investigation, $5,173.80 for retrofitting the utility trench, and $26,208.50 to remediate existing cosmetic damage.

### a. *Reconstructing the Foundation*

122.   The Insureds agreed during their closing argument that if the utility trench was the proximate cause of the damage, the Insureds are not entitled to a fully reconstructed foundation.

123.   Although the Court finds that the Jesusita Fire is the cause of the damage, because the fire caused the construction of the trench as well as changes in vegetation and irrigation, the Insureds are not entitled to the cost of reconstructing and underpinning the foundation.  All parties agree that the foundation is not now and was never designed to withstand the pressure of the expansion of soils beneath the house.  The Jesusita Fire did not cause the foundation to be inadequate.

124.   Even the Insureds' expert Stark agreed that his proposal for a new underpinned foundation is an upgrade to the foundation that existed before the Jesusita Fire.  Stark testified that the upgrades are only designed to bring the foundation up to the standard of applicable building codes, and the Insureds argue that these upgrades are covered under the Policy because they are required to bring the Property up to the standard required by applicable building codes.

125.   However, the Policy does not require Encompass to repair conditions that existed on the Property before the Policy was issued, or upgrade the Property to ensure that it complies with applicable law.  It only requires Encompass to insure against damage proximately caused by a covered peril.  Although the Jesusita Fire caused damage for which Encompass is liable under the Policy, it did not cause the foundation to be constructed to be unable to withstand the periodic expansion of expansive soils on which it sits.

126.   Accordingly, the Insureds are not entitled to recover the cost of reconstructing the foundation.

//

**b.** *Amounts Paid to Geolabs*

127.   The Insureds argue that they are entitled to recover the amount the Insureds paid to Geolabs in connection with the litigation to investigate the cause of the damage and prepare its expert report setting forth its causation analysis and a proposal to remediate the damage.  The Insureds paid Geolabs invoices dated between March 2012 and May 2014 totaling $47,080.98.  (Ex. 246).

128.   The Insureds have presented no legal basis, nor can the Court identify one, for the proposition that Encompass was required under the Policy to fund the Insureds' extensive investigation into the cause of the damage.  Encompass correctly concluded that it was not responsible to pay for the investigation by Geolabs when it refused to pay the $33,200 Geolabs initially estimated for its investigation.  (Ex. 214).  Encompass conducted an adequate investigation into the cause of the damage and relied on the opinions of the investigating experts in denying coverage.

129.   The Insureds may have been entitled to these costs as damages from a bad faith denial of coverage, but as discussed below, Encompass did not breach the covenant of good faith and fair dealing.

130.   Accordingly, the Insureds are not entitled to recover the amounts paid to Geolabs for its investigation.

**c.** *Excavating and Waterproofing the Utility Trench*

131.   As the result of the Jesusita Fire, a utility trench was constructed that causes the concrete slab on the northwest side of the Property to heave.   The Policy covers the cost of retrofitting the utility trench by excavating it, removing the layer of sand, installing a waterproofing layer, and refilling and compressing the trench according to applicable building codes.

132.   Encompass's expert Gillespie submitted a report and testified that these repairs would cost $5,173.80.  Perez estimated on the witness stand that these repairs would cost approximately $4,500.  Gillespie's estimate was evidently the product of a more thorough investigation, and is more likely to reflect the actual cost of these repairs.

133.   The Court finds that the Insureds are entitled to damages in the amount of **$5,173.80** to repair the utility trench.

### d. *Repairing Cosmetic Damage Inside the House*

134.   The most direct result of the damage caused by the Jesusita Fire is the visible cosmetic damage in the interior of the house, including the separation of walls from floors, cracking in the walls and floors, and other damage.

135.   Perez testified that these repairs would cost an estimated **$26,208.50**. Encompass did not challenge this testimony.

136.   The Court finds that the Insureds are entitled to damages in the amount of **$26,208.80** to repair the existing damage on the interior of the house.

### e. *Total*

137.   The Insureds are entitled to a total of **$31,382.30** on the breach of contract claim.

### 4. Breach of Implied Covenant Claim

138.   The Insureds argue that Encompass breached the implied covenant of good faith and fair dealing in two ways: ***first***, Encompass did not adequately investigate the Insureds' claim, relying solely on the biased investigation of Robertson and ignoring evidence tending to suggest that the damage was covered under the Policy, and ***second***, Encompass did not establish and implement reasonable standards for investigation and processing of claims.

139.   The precise amount of damages the Insureds seek as a result of the breach of the implied covenant is unclear.  The Insureds argued during their closing argument that, for both of their claims together, they are entitled to a total amount of $920,750.98 (which includes certain attorneys' fees and costs incurred before August 8, 2014, in excess of $450,000), plus attorneys' fees and costs through the conclusion of the proceedings.

### a. *Adequacy of Investigation*

140.   The Insureds failed to prove that Encompass failed to adequately investigate their claim.  As discussed above, the damage was covered under the Policy, and thus

Encompass should not have denied the claim.  Nevertheless, there is no liability for bad faith denial of the claim, even if wrongful, unless the denial was unreasonable.  The evidence at trial showed that Encompass's denial of coverage was not unreasonable.

141.   The evidence showed that upon receipt of the claim, Evanoff promptly began to investigate whether the damage was covered under the Policy.  Evanoff visited the Property soon after receiving the claim.  He observed the damage and discussed the condition of the Property with the Insureds.  He discussed the Insureds' belief that the damage was covered under the Policy because it resulted from the Jesusita Fire.

142.   Evanoff recommended that the Property be inspected by a geotechnical engineer to ascertain the cause of the damage.  Evanoff offered the Insureds the opportunity to hire an engineer of their choosing to perform the investigation.  When the Insureds were unable to locate a geotechnical engineer, Evanoff solicited a recommendation for an engineer from its counsel.  Evanoff suggested Robertson to the Insureds, and the Insureds agreed to hire Robertson.  The Insureds did not complain that Robertson was unqualified or biased until after Robertson completed his investigation and issued both of his reports.  Berger testified that he was not informed that counsel for Encompass had recommended Robertson, but that fact neither had to be disclosed nor indicates that Evanoff was not entitled to rely on Robertson's opinions.

143.   Robertson's investigation was sufficient to determine the cause of the damage to the Property.  Robertson reviewed photographs, reviewed the reports of prior experts who had inspected the Property, discussed the damage and the history of the Property with the Insureds, performed a manometer survey, and observed a leak detection test.  From this investigation, Robertson concluded that earth movement from swelling of expansive soils pushing on a foundation that was not properly constructed to withstand the pressure, rather than the Jesusita Fire, caused the damage to the Property.  This conclusion was reasonable and supported by the evidence available to him.

144.   Evanoff in fact relied on the opinions of Robertson, a qualified expert, in denying the Insureds' claim.

145.   The Insureds failed to prove that Robertson was a biased expert on whose opinion Encompass was not entitled to rely.

146.   Swed testified that Robertson told her that he was hired to find a basis on which Encompass could deny the claim.  Berger originally recalled that Robertson had separately made a similar statement to him, but later stated that Robertson may only have made the statement to Swed.  Robertson denied making any such statement.

147.   This testimony did not prove that Robertson was biased.  It is not credible that Robertson made this blunt statement of bias, because the Insureds did not inform Evanoff that they believed Robertson was biased until well after Robertson completed both of his visits to the Property and rendered both of his reports concluding that the Jesusita Fire was not the cause of the damage.  Had Robertson shown so clearly that he was biased in favor of Encompass, surely the Insureds would have complained and demanded use of a different geotechnical engineer at some point in the several months between the alleged statement during Robertson's initial site visit in August 2011 and his second report in November 2011.

148.   Furthermore, the evidence presented at trial does not support the conclusion that Robertson is a mere mouthpiece for insurance companies.  Although much of his work is funded by insurance companies, he testified that he regularly works for both insurance companies and insureds.

149.   The Court does not mean to suggest that Swed was not a truthful witness.  Having observed both of them on the stand, it was clear that she and Robertson simply would not get along; she no doubt found him slick and untrustworthy from the beginning.  It is likely that Robertson made some sort of comment about the process, which Swed now recalls in the worst possible light.

150.   Cannon made a defense of Robertson that was not directly responsive to the question asked.  His testimony was suggestive of a cozy "Allstate family" in a way that was not helpful to Encompass; nonetheless, both Robertson and Cannon credibly testified in ways helpful to Encompass.

151.   Even if Robertson perceived his role in the way the Insureds allege, he is too shrewd ever to say so.

152.   Accordingly, Encompass is protected from bad faith liability under the "genuine dispute" doctrine, because there was a genuine dispute as to whether the damage to the Property was caused by a covered peril, and because Evanoff relied on the opinions of a qualified, unbiased expert regarding the cause of the damage.

### b. *Failure to Establish Reasonable Standards for Investigation*

153.   The Insureds failed to prove that Encompass failed to establish reasonable standards for investigation of its insureds' claims.  As discussed above, Encompass adequately investigated the Insureds' claim.  Cannon credibly testified that Encompass's investigation met industry standards.  Accordingly, there was no breach of the implied covenant on this basis.

## II. CONCLUSIONS OF LAW

### A. Efficient Proximate Cause Doctrine

154.   In a claim by an insured challenging a denial of coverage, the insured has the initial burden of showing that its claim is within the policy's basic coverage.  *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 758, 15 Cal. Rptr. 2d 815 (1993) (citing *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 406, 257 Cal. Rptr. 292 (1989)).  The burden of proof then shifts to the insurers to show that other policy language excluded all or part of the claim.  *See Garvey*, 48 Cal. 3d at 406.  Ambiguities in insurance policies are resolved in favor of the insured.  *See Price v. Zim Israel Navigation Co.*, 616 F.2d 422, 426 (9th Cir. 1980).

155.   No party disputes that the Insureds have met their initial burden of showing that their claim is within the policy's basic coverage.

156.   When a particular harm has multiple separate but interrelated causes, California courts look to the "efficient proximate cause" in order to determine whether the claim is covered under the insurance policy.  *See* Cal. Ins. Code § 530 ("An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril

not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause.").

157.   The efficient proximate cause has been variously defined as the "predominating cause" or "most important" cause.  *See Garvey*, 48 Cal. 3d at 403 (defining efficient proximate cause as "predominating cause"); *Alex R. Thomas & Co. v. Mut. Serv. Cas. Ins. Co.*, 98 Cal. App. 4th 66, 72, 199 Cal. Rptr. 2d 394 (2002) (efficient proximate caused means "predominant or most important" cause).

158.   The California Supreme Court has also described efficient proximate cause as the moving cause or the cause "that set others in motion," *Sabella v. Wisler*, 59 Cal. 2d 21, 27 Cal. Rptr. 689 (1963), but it has later pulled away from this definition, because it may be used to erroneously deny coverage when the efficient proximate cause is not a "trigger" but occurs later on the causation chain.  *See Garvey*, 48 Cal. 3d at 403-04; *Tento Int'l, Inc. v. State Farm Fire & Cas.*, 222 F.3d 660, 663 (9th Cir. 2000) (holding that the efficient proximate cause is not necessarily the moving cause or the cause that set the others in motion, but rather the predominating or most important cause of the loss).

159.   Under certain circumstances, an insurance company may be liable for coverage so long as the covered peril was one of two or more independent, concurrent proximate causes of harm, even if the covered peril was not the efficient proximate cause. *See State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 104-05, 109 Cal. Rptr. 811 (1973).  The California Supreme Court has clarified that this concurrent causation approach is not applicable in first-party property damage coverage cases like the case at hand.  *See Garvey*, 48 Cal. 3d at 398 ("In recent years, some courts have misinterpreted and misapplied our decisions in [*Sabella*] and [*Partridge*].  In so doing, they have allowed coverage in first party property damage cases under our holding in *Partridge* by inappropriately using the Partridge concurrent causation approach as an alternative to *Sabella*'s efficient proximate cause analysis.").  Accordingly, the efficient proximate cause framework, rather than the concurrent causation framework, applies here.

//

160.   "For the efficient proximate cause theory to apply, . . . there must be two separate or distinct perils which 'could each, under some circumstances, have occurred independently of the other and caused damage.'"   *Pieper v. Commercial Underwriters Ins. Co.*, 59 Cal. App. 4th 1008, 1020, 69 Cal. Rptr. 2d 551, 557 (1997) (quoting *Finn v. Continental Ins. Co.*, 218 Cal. App. 3d 69, 72, 267 Cal. Rptr. 22, 24 (1990)).

161.   If two separate causes contributed to the ultimate harm, coverage is required even if the covered peril caused an excluded peril, so long as the covered peril was the efficient proximate cause.   *See, e.g.*, *Sabella*, 59 Cal. 2d at 31-32 (coverage required where two covered perils, negligent construction of a sewer and inadequate compaction of fills, contributed to cause an excluded peril, settling).

162.   Encompass argues that there is only one cause of the damage to the Insureds' property: swelling of expansive soils beneath the home's foundation.   Although various factors may have contributed to the harm, the sole cause of harm is the swelling, which is excluded under the policy exclusion for earth movement or settling, shrinking, bulging, or expansion.   If there is only one cause of harm, the efficient proximate cause theory will not apply.   *See Finn*, 218 Cal. App. 3d at 72 ("leakage" and "broken pipe" were not separate causes).

163.   The parties may not artificially split a single cause into multiple causes in order to create or deny coverage.   As one court aptly pointed out, an expansive view of causation would result in the eradication of policy exclusions in an all-risk policy, because an excluded peril may be said to be caused by some broader cause that is not specifically excluded.   "An earthquake, it could be said, was merely the immediate cause of loss and was itself the result of 'changing tectonic forces,' a nonexcluded peril.   Wear and tear on floorboards would be covered as the result of nonexcluded 'friction.'"   *Chadwick v. Fire Ins. Exch.*, 17 Cal. App. 4th 1112, 1117, 21 Cal. Rptr. 2d 871 (1993) (holding that "latent defect" or "inherent vice" exclusion applied to deficient framing techniques in construction of a house, even though the builder's negligence was a covered peril, because the two "causes" were not separate from one another).

164.   Here, it is undisputed that the damage to the Insureds' home resulted from swelling and contraction of expansive soils.  But it is also undisputed that a number of factors caused the movement of the soils.  California courts have repeatedly held that the efficient proximate cause controls coverage, even if an excluded peril is the ultimate result of the efficient proximate cause.  *See Sabella*, 59 Cal. 2d at 31-32 (policy exclusion for "settling" did not preclude coverage because two covered perils, negligent construction of a sewer and inadequate compaction of fills, had caused the settling); *Brian Chuchua's Jeep, Inc. v. Farmers Ins. Grp.*, 10 Cal. App. 4th 1579, 13 Cal. Rptr. 2d 444 (1992) (coverage afforded under policy excluding pollution damage, where damage was caused by an earthquake resulting in leaking gasoline); *Gillis v. Sun Ins. Office, Ltd.*, 238 Cal. App. 2d 408, 415-20, 47 Cal. Rptr. 868 (1965) (coverage afforded under policy insuring loss by windstorm but excluding loss from water damage, where wind, causing gangway to fall on and cause water damage to a dock, was deemed the efficient proximate cause of the loss); *Sauer v. Gen. Ins. Co.*, 225 Cal. App. 2d 275, 278-79, 37 Cal. Rptr. 303 (1964) (coverage afforded under policy excluding subsidence damage, when subsidence damage was caused by a leaking plumbing system, which was covered).

165.   In a case very similar to the present case, the policy at issue excluded "earth movement" and "water damage," regardless of the cause.  *Howell v. State Farm Fire & Casualty Co.*, 218 Cal. App. 3d 1446, 267 Cal. Rptr. 708 (1990).  The insurer denied coverage for damage resulting from a landslide following heavy rains.  The court of appeal held that there was a triable issue of fact as to whether the efficient proximate cause of the harm was a covered peril—a fire that had removed significant vegetation in the surrounding area.  *Id.* at 1459-60.  The fact that the excluded peril—earth movement—was the result of the covered peril did not preclude coverage.

166.   In *Hanna v. Interstate Business Men's Accident Ass'n*, 41 Cal. App. 308, 182 P. 771 (1919), the policy at issue covered death "on account of bodily injury . . . by external, violent, and accidental means," but explicitly excluded liability "if the bodily injury be a hernia."  *Id.* at 309.  The decedent had suffered a violent accident that caused a

hernia, and the insurer argued that coverage was excluded because the cause of death was the hernia.  The court of appeal held that whether or not the hernia caused the death, the cause of both the hernia and the ultimate death was the accident.  "[T]he hernia must be regarded as the result of the accident, and the accident itself, and not the resultant hernia, as the cause of the death."  *Id.* at 310.

167.   And in *Julian v. Hartford Underwriters Insurance Co.*, 35 Cal. 4th 747, 750, 27 Cal. Rptr. 3d 648 (2005), the insured sought coverage under a homeowner's insurance policy for damage resulting from a landslide.  The policy excluded "earth movement" as well as "weather conditions" that "contribute in any way with" an excluded cause or event.  *Id.* at 750.  The California Supreme Court held that the weather conditions exclusion excluded heavy rains contributing to earth movement, which was the efficient proximate cause.  *Id.* at 752.  Although the court ultimately held that the claim was excluded, it did not rely on the blanket policy exclusion for earth movement, even though earth movement was undisputedly the most direct cause of the ultimate harm.

168.   The cases make clear that a policy like the one at issue here, in which "earth movement" and "settling, shrinking, bulging, or expansion" are excluded but fire damage is covered, will be read in California courts as covering damage resulting from earth movement so long as the efficient proximate cause of the earth movement was a fire.

## B. <u>Determining Efficient Proximate Cause</u>

169.   The determination of the efficient proximate cause is ordinarily a question of fact for the jury, *Howell v. State Farm Fire & Cas. Co.*, 218 Cal. App. 3d 1446, 1459, 267 Cal. Rptr. 708 (1990), but when the facts are undisputed, it becomes a question of law, *Sabella*, 59 Cal. at 32.

170.   The California Supreme Court has defined efficient proximate cause as the "predominating cause."  *Garvey*, 48 Cal. 3d at 403.  When the question is presented to the jury, the Judicial Council of California suggests instructing the jury as follows: "When a loss is caused by a combination of covered and excluded risks under the policy, the loss is

//

covered only if the most important or predominant cause is a covered risk."  CACI §
2306.

171.   In determining whether a particular cause may be the efficient proximate
cause, various courts have looked to whether the cause set in motion a series of events
leading to the eventual harm.  *See Sabella*, 59 Cal. 2d at 31-32; *Howell*, 218 Cal. App. 3d
at 1459 (holding that jury could find that fire was efficient proximate cause where expert
had testified that had the fire not destroyed surrounding vegetation, the landslide likely
would not have occurred); *Gillis*, 238 Cal. App. 2d at 421 ("[Predominating cause]
creat[ed] a condition that permitted natural forces, which alone may have caused no
damage, to effect the damage for which recovery is sought.").

172.   The California Supreme Court has clarified, however, that a mere
"triggering" cause is not the efficient proximate cause.  *Garvey*, 48 Cal. 3d at 403.
Furthermore, the California Supreme Court has admonished lower courts to look to the
predominating or most important cause, which is not necessarily the moving cause.  *Id.*

173.   Hence, one factor some courts have considered in determining the efficient
proximate cause is whether a particular peril rendered damage inevitable.  *See State Farm
Fire & Cas. Ins. Co. v. Von Der Lieth*, 54 Cal. 3d 1123, 1132, 2 Cal. Rptr. 2d 183 (1991)
(holding that evidence supported jury's finding that third-party negligence was the
predominating cause of a landslide: "By developing the hillside with septic tanks instead
of sewers and failing to properly dewater the hillside, it was inevitable the ancient
landslide would be reactivated, causing damage to a substantial number of properties on
the mesa.").

174.   Another factor courts have considered is the timing of the damage.  For
instance, a sudden accident rather than a latent risk may be held to be the predominating
cause if the damage occurred close in time to the accident and the defect had not caused
comparable harm at any time in the past.  *See Sauer*, 225 Cal. App. 2d at 279 ("The virtual
absence of subsidence damage in the prior four years of the existence of the house here in
//

1   question clearly indicates that the broken pipe [rather than settling or sinking of the earth]

2   was the predominating or moving efficient cause of the loss.").

3         C. **Bad Faith Denial of Insurance Claim**

4         175.   Liability for bad faith denial of an insurance claim in a first-party policy

5   emerges from the unreasonable withholding of plan benefits. *Gourley v. State Farm Mut.*

6   *Auto. Ins. Co.*, 53 Cal. 3d 121, 127, 3 Cal. Rptr. 2d 666 (1991) (determining that the

7   insured is not entitled to prejudgment interest under Cal. Civ. Code § 3291 on a bad faith

8   denial of coverage claim because the claim is not a personal injury claim).

9         176.   "There are at least two separate requirements to establish breach of the

10   implied covenant: (1) benefits due under the policy must have been withheld; and (2) the

11   reason for withholding benefits must have been unreasonable or without proper cause."

12   *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 278, 37 Cal. Rptr. 3d

13   434 (2005) (holding that the insured could not state a claim for breach of the implied

14   covenant without showing the withholding of a benefit that was in fact due under the

15   contract).

16         177.   An insurer "must give at least as much attention to the [insured's] interests as

17   it does its own," and "cannot reasonably and in good faith deny payments to its insured

18   without thoroughly investigating the foundation for its denial." *Egan v. Mut. of Omaha*

19   *Ins. Co.*, 24 Cal. 3d 809, 819, 169 Cal. Rptr. 691 (1979) (holding that where undisputed

20   evidence showed that the insurer failed to properly investigate the insured's claim, the

21   court properly held that a breach of the implied covenant was established as a matter of

22   law).

23         178.   An insurer fails to fulfill its duty to investigate if, when presented with

24   credible expert opinions suggesting that the claim is covered, it ignores those facts without

25   any attempt at adequate investigation, and reaches contrary conclusions without any

26   scientific foundation. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 753, 68 Cal. Rptr.

27   3d 746 (2007) (holding that insured had raised triable issue of fact as to whether insurer

28   breached the covenant of good faith by failing to investigate insured's claim, where

insured had presented medical evidence of degenerative spine disease resulting from trauma, and the insurer denied the claim without conducting any investigation on the basis of the unfounded opinion that the insured suffered from a preexisting degenerative disorder).

179.   "An unreasonable failure to investigate . . . may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." *Shade Foods, Inc. v. Innovative Product Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 880, 93 Cal. Rptr. 2d 364 (2000) (holding that insurer's rapid closing of the file after little investigation and failure to develop a plausible theory of the cause of a loss supported the jury's finding of bad faith liability); *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624, 50 Cal. Rptr. 2d 224 (1996) (holding that insurance company breached covenant of good faith when it ignored medical evidence that insured died of accident and based its denial of coverage solely on evidence suggesting that insured may have died of illness).

180.   On the other hand, the insurer is generally protected from bad faith liability where there is a genuine issue as to coverage.  *See Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992-93 (9th Cir. 2001).  The "genuine issue" doctrine may be raised when the genuine dispute is legal, regarding whether a particular claim is covered under the policy, or when the dispute is factual.  *Id.* at 994-95 (holding that factual dispute as to whether insured had lost all items she had claimed to lose in fire, supported by investigation by experts who concluded that few of the items were present in the fire wreckage, protected insurer from bad faith liability).

181.   Likewise, an insurer is generally protected from bad faith liability when it relies on the opinions of independent experts.  *See Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1291, 97 Cal. Rptr. 2d 386, 391 (2000) (holding that the parties' experts' dispute over the proper cost of repairs following a fire protected the insurer from bad faith liability, even when a substantial disparity existed between the experts' opinions).

//

### III.   **VERDICT**

The Court finds and rules as follows:

1. On Plaintiff's Claim 1 for declaratory relief: In favor of Defendants.

2. On Counterclaimants' Claim 1 for breach of contract: In favor of Counterclaimants.

3. On Counterclaimants' Claim 2 for breach of the implied covenant of good faith and fair dealing: In favor of Counter-Defendants.

4. Defendants and Counterclaimants shall have damages in the amount of $**31,382.30**.

The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 54 and 58(b).

Dated:  October 7, 2014

_____
MICHAEL W. FITZGERALD
United States District Judge